## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| M3 ACCOUNTING SERVICES, INC., | |
| Plaintiff, | |
| v. | |
| WESLEY DEAN, DARRYL J. LANDRENEAU, KALEO TECHNOLOGY, LLC, and BLACK OPS SOLUTIONS & SYSTEMS, LLC, | CIVIL ACTION NO. |
| Defendants. | |

## COMPLAINT

Plaintiff M3 Accounting Services, Inc. files this Complaint against Wesley Dean, Darryl J. Landreneau, Kaleo Technology, LLC, and Black Ops Solutions & Systems, LLC and alleges as follows:

## I.      PARTIES

1.      Plaintiff M3 Accounting Services, Inc., d/b/a M3 Enterprising Hospitality ("Plaintiff" or "M3") is a software and service company organized and existing pursuant to the laws of the state of Georgia with its principal place of business in Georgia.

2.      Defendant Wesley Dean ("Dean") is an individual citizen of the state of Georgia residing, upon information and belief, in Forsyth County, Georgia.

3.      Defendant Darryl J. Landreneau ("DJ") is an individual citizen of the state of Georgia residing, upon information and belief, in Forsyth County, Georgia.

4.      Defendant Kaleo Technology, LLC ("Kaleo") was a limited liability company organized and existing pursuant to the laws of the state of Georgia with its principal place of business in Georgia.  Information filed with the Georgia Secretary of State reflects that Kaleo was dissolved in December 2015.

5.      Defendant Black Ops Solutions & Systems, LLC (hereinafter "B.O.S.S.") was a limited liability company organized and existing pursuant to the laws of the state of Georgia with its principal place of business in Georgia. Information filed with the Georgia Secretary of State reflects that B.O.S.S. was administratively dissolved in September 2012.

## II.    JURISDICTION AND VENUE

6.      Jurisdiction is proper in this court pursuant to 18 U.S.C. § 1331 as Plaintiff is asserting valid federal claims arising out of the federal Racketeer Influences and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

7.     Jurisdiction is proper in this court with respect to the state claims alleged, as they are so related to the federal claims that they form the same case or controversy under Article III.  28 U.S.C. § 1367.

8.     Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) as it is the district in which a substantial part of the events giving rise the claims alleged occurred.  Venue is also appropriate under 18 U.S.C. § 1965.

III.   **FACTUAL BACKGROUND**

  A.     **Wesley Dean's Employment at M3**

9.     Wesley Dean was employed, as the Executive Vice President of Technology, by Plaintiff from May 3, 2010 to October 6, 2014 to, among other things, assist in developing security software for the company.  During that time, Dean became a stockowner and the third largest owner of the company.

10.    As such, Dean was given broad latitude to contract with third-party vendors on behalf of M3 in order to retain the appropriate expertise necessary to accomplish M3's various security and software projects.

11.    Wesley Dean was terminated from M3 on or about October 6, 2014 for the destruction of company property.

**B.     Dean's Purchase of Stock from M3**

12.     M3's Chief Executive Officer is, and at all times relevant was, John McKibbon.  Mr. McKibbon is also M3's largest stockowner.

13.     Dean purchased 8,000 employee shares of M3 common stock from Mr. McKibbon by issuing to Mr. McKibbon a Promissory Note dated December 31, 2011.  Dean never made any payments on the Promissory Note, and at the time of Dean's termination, a total of $616,570 in principal and accrued interest were due and owing on the Promissory Note.

14.     Upon Dean's termination, Dean, M3, and Mr. McKibbon entered into a Separation Agreement.  The Separation Agreement set forth certain terms with respect to Mr. McKibbon's buy-back of company stock held by Dean as well as M3's engagement of Dean to potentially provide certain consulting services after his termination.

**C.     Black Ops Solutions & Systems, L.L.C.**

15.     On August 10, 2010, Dean filed Black Ops Solutions & Systems, L.L.C.'s ("B.O.S.S.") Articles of Incorporation with the Secretary of State in Georgia.  The Articles of Incorporation listed Dean as the sole member and manager of B.O.S.S.

16.     On August 27, 2010, Dean opened a financial account (Acct. no. xxxxxx3150) at United Community Bank on behalf of B.O.S.S. as the company's sole member and manager.

17.     According to documents filed with United Community Bank, B.O.S.S. was described as a "computer service" company.

18.     As of December 2018, DJ holds himself out as the Founder of B.O.S.S. and falsely represents that it existed from 2008 to 2015.

### D.     Kaleo Technology

19.     On August 23, 2012, DJ filed Kaleo Technology L.L.C.'s ("Kaleo") Articles of Incorporation with the Secretary of State in Georgia.  The Articles of Incorporation listed DJ as the manager and registered agent for Kaleo.

### E.     Defendants' Fraudulent Scheme

20.     As a shareholder and Executive Vice President of Technology of M3, Dean was responsible for several company projects for which Dean claimed that M3 needed services provided by third-party vendors.

21.     At Dean's direction after written recommendation to M3 leadership, M3 contracted with several third-party vendors.

22.     In an August 23, 2010 email to Allen Read, the President of M3 and individual to whom Dean reported, Dean proposed that the company utilize

B.O.S.S. as a vendor to provide specialized services.  In the email, Dean portrayed and represented B.O.S.S. as established and well-known in the information security industry.  Dean claimed to have visited the company's purported facilities abroad and to have utilized their services for projects in the past.  The email is attached as Exhibit A.

23.    Dean's representations and portrayals regarding B.O.S.S. were false. In reality, Dean formed B.O.S.S. less than two weeks before the date of the email. Accordingly, B.O.S.S. had no reputation in the field, no ability to provide specialized services to M3 beyond those services Dean would have provided in his role as the Executive Vice President of Technology of M3, and B.O.S.S. had no facilities of any kind, international or otherwise.

24.    In the email, Dean withheld his affiliation with B.O.S.S. from M3, including the fact that Dean was the sole owner and manager of B.O.S.S. and that B.O.S.S.'s sole bank account, Acct. no. xxxxxx3150 at United Community Bank, was owned by Dean.

25.    At all times relevant, M3's company policies forbid an employee and the employee's immediate family from owning or holding significant interest in a supplier, customer, or competitor of M3.  Company policy also forbid an employee from taking outside employment without written approval and forbid any

employment involving "organizations that are doing or seek to do business with" M3, "including actual or potential vendors or customers."

26.    On information and belief, Dean and DJ intended to use B.O.S.S. as a shell corporation to receive misappropriated assets from M3.

27.    While legitimate third-party vendors, including ANMSoft and Chetu, provided actual services to M3, Dean convinced M3, using fraudulent misrepresentations and omissions, to utilize B.O.S.S. and Kaleo as intermediary companies, or "project managers" as described in invoices submitted to M3 by B.O.S.S. and Kaleo, rather than deal directly with the legitimate third-party vendors.

28.    But in reality, no such "project management," or any other kind of services, were performed by B.O.S.S. and Kaleo, other than ordinary vendor management skills performed by Dean and DJ themselves.

29.     Any such services performed by Dean were the same services that Dean was obligated to perform in the ordinary course of his responsibilities as a shareholder and Executive Vice President of Technology for M3 as outlined in detail in his job description.

30.     Nevertheless, Dean and DJ falsely represented that both B.O.S.S. and Kaleo performed certain specialized services for M3 and submitted invoices to M3 for those non-existent services.

31.     For example, in one invoice dated October 20, 2010, B.O.S.S. represented that three of its engineers spent 528 hours researching for a project called "ACH Project," and that those services totaled $13,200.00.  That invoice is attached as Exhibit B.

32.     In reality, upon information and belief, B.O.S.S. had no engineers or any employees of any kind other than Dean himself, one individual residing in Florida, and DJ.

33.     Upon information and belief, Dean or DJ created the invoices.

34.     In addition, for services that were actually provided by legitimate third-party vendors, like ANMSoft, B.O.S.S. invoices to M3 reflected a charge greater than that actually charged by third-party vendors.  For example, in the December 15, 2010 invoice attached as Exhibit C, B.O.S.S. billed M3 $68,000 for ANMSoft services billed during the month of November 2010.  However, the November 16, 2010 invoice attached as Exhibit D from ANMSoft to B.O.S.S. reflected a fixed charge of $23,606 charged by AMNSoft to M3 for the same services.  In other words, B.O.S.S., owned by Dean, overcharged M3 for the

reimbursement of legitimate ANMSoft services by $44,394 for AMNSoft services for the month of November 2010 alone.

35.     Beginning in September 2010 through March 2015, B.O.S.S. tendered invoices for the vendor ANMSoft, for services totaling $1,447,183.  Records from ANMSoft indicate that its services for M3 actually took place between November 2010 and August 2012. The total amount charged for services rendered by ANMSoft during that period was $334,180. Accordingly, M3 paid B.O.S.S. $1,447,183 for services rendered by ANMSoft, in the amount of $334,180, an overpayment of approximately $1,113,003.   The payments made by M3 to B.O.S.S. were paid to the order of Kaleo Technology on the instruction of Dean.

36.     After the fraudulent scheme began, Dean continued to make false representations to M3 so that M3 would continue to make payments to Defendants for non-existent or overcharged services.  For example, on March 17, 2011, Dean wrote the following to M3's President Allen Read in an email attachment that is attached to this Complaint as Exhibit E:

> These are the key players, and they are all operating under the B.O.S.S. umbrella, so that: 1) M3 can abstract themselves away from the Skywalker project; 2) B.O.S.S. can take care of all the invoicing, personnel issues, payroll and time sheet management requirements; 3) M3 can get the project management and business analyst bandwidth that it needs without hiring additional staff; and 4) M3 can get one invoice for all the work that is being done on our behalf.   This has worked out very well so far.  The B.O.S.S. team is capable of doing

all aspects of the projects: analysis and design, architecture / framework, development to deployment.  The other teams cannot do it all - - they tend to be stronger in the pure development area - - but are lacking in program management, architectural leadership and visioning. Soltech, for example, does very good application development work, but they are not as strong in the area of defining architectures and solutions that can be leveraged well into the future.

Therefore, I've has worked closely with them, and we have had DJ and his team members (B.O.S.S.) work closely with them to ensure that we're getting exactly what we need both for today and for our future needs.  There is also no added cost from a project perspective by setting the projects up in this manner, and there are almost certainly cost savings in the long term.  Again, this is because M3 is severely limited in the business analyst, product management, and project management areas. If we did not fill this need through our consulting partners, we would have to hire more FT staff to do so. Rather than add long term overhead for a relatively short term and intense development effort, we're getting what we need in those areas while imposing a constrained budget on the project work at the same time.  The net is that our consultant must provide what we need in the areas where we have a shortfall, but they also have to do it while accomplishing the work we need within a limited budget. It is a difficult assignment for them, but it maximizes our ROI on the consulting engagements, while reducing our long term costs.

37.    These statements were materially false for several reasons, including that B.O.S.S. had no employees of any kind other than Dean, DJ, and one individual in Florida; B.O.S.S. had no capabilities of any kind other than those of Dean, DJ, and the individual in Florida; and because as Dean, through B.O.S.S., overcharged M3 for services performed by legitimate third-party vendors by at least $2.7 million, there was no cost savings to M3.

38.     Beginning in July 2012 through March 2015, B.O.S.S. tendered invoices for another third party vendor, Chetu, for services totaling $4,459,399. Records from Chetu indicate that their services rendered to Kaleo Technology on behalf of B.O.S.S. actually took place between September 2012 and May 2015. The total amount charged for services rendered by Chetu during that period totaled $2,899,096.  Accordingly, M3 paid B.O.S.S. $4,459,399 for services rendered by Chetu in the amount of $2,899,096, an overpayment of approximately $1,560,303.

39.     From 2010 to 2017, M3 paid at least $7,939,802 to B.O.S.S. and Kaleo for alleged services rendered to the Plaintiff.

40.     Thus, because of Defendants' intentional fraudulent scheme, M3 was defrauded by at least $2,673,306.

41.     Defendants used Dean's position of trust and elevated status as a shareholder at M3 to induce Plaintiff to rely on Dean's misrepresentations.

42.     Defendants ultimately succeeded in misappropriating a significant amount of money from M3 over time as a result of their concerted effort to systematically defraud Plaintiff.

## IV.   DEFENDANTS SPEND MISAPPROPRIATED ASSETS

43.     Defendants used the misappropriated assets for the following items, among other expenditures:

a. $17,412 for ATV purchase and repair;

b. $386,000 for Catapult Group;

c. $416,884 for gold and coin purchases;

d. $246,092 for boats and boating related expenses;

e. $20,825 for fishing related expenses;

f. $4,557 for flight lessons;

g. $211,228 for guns and armament expenses;

h. $30,915 for sports and miscellaneous hobbies;

i. $415,167 for legal fees;

j. $41,500 for loan to Linda Brown and payments to lenders (Quicken Loans and Advance Financial Corp.);

k. $38,000 for payments to Cathy Landreneau;

l. $411,111 for payments to DJ;

m. $17,674 for payments to Ethan Dean;

n. $252,474 for payments to Pamela Dean;

o. $249,560 for payments to Dean;

p. $100,000 for a stock purchase in Prime Revenue;

q. $69,837 for purchases of University of Georgia and other sporting tickets; and

r.  $86,164 for purchase of Acura MDX and Ford vehicles.

44.    M3 has no knowledge as to whether any of these assets remain in the custody or control of one more Defendants.

## V.    CAUSES OF ACTION

### COUNT I:  FRAUD
### (AGAINST DEAN, B.O.S.S., AND KALEO)

45.    Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

46.    Dean, B.O.S.S., and Kaleo intentionally made false representations to M3 in an effort to induce Plaintiff to pay B.O.S.S. and Kaleo for services that they did not perform or for services performed by legitimate third-party vendors in an amount greater than those vendors actually charged.

47.    Beginning on August 23, 2010, Dean made false representations to M3 about B.O.S.S.  Specifically, Dean claimed that the company was well known in the world of private military contractors and that he had utilized their services in the past.  Dean represented that B.O.S.S. had facilities around the world that Dean had personally inspected.  At the time Dean made these false representations, he had in reality formed B.O.S.S. mere weeks earlier.

48.    Dean conveyed to M3 that B.O.S.S. and Kaleo would be performing services for M3.  In reality, B.O.S.S. was intended to be used by Defendants as a

shell company – as a means to gain control of misappropriated assets from M3. Neither B.O.S.S. nor Kaleo performed any legitimate services for M3 other than those that Dean was already obligated to perform in his roles as the Executive Vice President of Technology and a stockholder of M3.

49.    Over the span of approximately seven years, Dean intentionally submitted invoices that falsely represented to M3 that B.O.S.S. and Kaleo performed services that were never rendered by B.O.S.S. and Kaleo.

50.    Dean, B.O.S.S., and Kaleo made these misrepresentations in an effort to induce payment by M3.

51.    Plaintiff relied on these representations and paid the fraudulent invoices based upon the reasonable belief that B.O.S.S. and Kaleo were legitimate companies that had provided actual services to M3.

52.    Plaintiff justifiably and detrimentally relied on Defendants' misrepresentations with respect to non-existent services provided by B.O.S.S. to M3, the amount due for actual services provided by legitimate third-parties, and Dean's representations concerning B.O.S.S. and Kaleo.  Among other things, M3's reliance was justified based on the fact that Dean had a fiduciary duty to M3 as part owner of the company.

53.     Defendants acted willfully and intentionally to deceive Plaintiff and in an effort to induce Plaintiff to rely on Dean's misrepresentations.

54.     Defendants received, converted, and retained the misappropriated assets in bank accounts that they controlled.  As a result, Plaintiff suffered damages in the amount of at least $2,673,306.

## COUNT II: VIOLATION OF GEORGIA CIVIL RICO ACT
## (AGAINST ALL DEFENDANTS)

55.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

56.     Dean and DJ formed B.O.S.S. and Kaleo Technology, respectively, with the intent to use those companies to defraud Plaintiff.  The Defendants each constitute a "person" as defined under Georgia's RICO statute.  O.G.C.A. § 16-1-3(12).

57.     The Defendants engaged in a pattern of racketeering activity through engaging in at least two incidents of fraud and theft, which incidents were violations of, among other things, O.C.G.A. §§ 16-8-2, 16-8-3, 16-8-4, 23-2-52, 51-61-1, 51-6-2, 51-6-4.  Specifically, and as set forth in more detail elsewhere in this Complaint, Defendants submitted invoices falsely representing that certain services were performed for M3 that were never performed and that certain services were performed by legitimate third-party vendors at a cost higher than the

actual charges for the services.  Defendants made these false representations knowingly, intentionally, and with malicious intent to induce M3 to rely on these misrepresentations and remit payment to Defendants for services that were never performed.

58.     Each Defendant agreed to and did participate in the enterprise and the illegal activity of the enterprise directly through, among other things, the creation and submission of invoices containing false misrepresentations.

59.     M3 did in fact rely on Defendants' misrepresentations and remit payment as induced by Defendants.

60.     This practice occurred at least 61 times when Defendants crafted separate fraudulent invoices for services rendered by Chetu and ANMSoft.  The Defendants intentionally deceived Plaintiff in this respect over the span of seven years on a monthly recurring basis.  All of these acts occurred after July 1, 1980 and at least one incident occurred within four years of a prior incident.

61.     Defendants' continued commission of predicate acts related to theft constitute a pattern of racketeering behavior.

62.     On information and belief, Dean and DJ maintained shared access to accounts held by Kaleo and B.O.S.S.

63.     The predicate acts of fraud were all interrelated in that the invoices were submitted systematically to M3 on a monthly basis.

64.     The Defendants collectively were an enterprise, and each of the Defendants is individually an enterprise.

65.     Defendants acted willfully and maliciously and ultimately succeeded in their scheme to defraud Plaintiff through a pattern of racketeering activity to acquire or gain control of Plaintiff's personal property, including money.

66.     As a direct and proximate result of Defendants' racketeering activity, Plaintiff suffered actual damages of at least $2,673,306 in payments to B.O.S.S. and Kaleo, and ultimately to Dean and DJ, for non-existent or overcharged services.

## COUNT III: CONSPIRACY TO VIOLATE GEORGIA CIVIL RICO ACT (AGAINST ALL DEFENDANTS)

67.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

68.     Beginning in 2010, the Defendants came together, or endeavored to come together, for a common purpose, willfully agreed, and conspired to defraud the Plaintiff in violation of O.C.G.A. §§ 16-8-2, 16-8-3, 16-8-4, 23-2-52, 51-61-1, 51-6-2, 51-6-4 and Georgia's RICO Act.

69.    The Defendants, and each of them, joined this conspiratorial scheme that contemplated that at least one of the co-conspirators would commit a predicate act, or an act in furtherance of a predicate act, in violation of O.C.G.A. §§ 16-8-2, 16-8-3, 16-8-4, 23-2-52, 51-61-1, 51-6-2, 51-6-4 and Georgia's RICO Act.

70.    As a direct and proximate result of the Defendants' conspiracy to defraud M3 in violation of Georgia's RICO Act, each of the Defendants' attempts to join the conspiracy, and each of the Defendants' willfully joining the conspiracy, Plaintiff suffered injury in the form of misappropriated assets of at least $2,673,306.

## COUNT IV: VIOLATION OF FEDERAL CIVIL RICO ACT
## (AGAINST ALL DEFENDANTS)

71.    Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

72.    Each of the Defendants is a "Person" under 18 U.S.C. § 1961(a) because each of the Defendants was either an individual or an entity formed under Georgia law as evidenced by paperwork on file with the Georgia Secretary of State.

73.    The Defendants jointly are an "Enterprise" under 18 U.S.C. § 1961(4) because they are, or were at all times relevant, a group of persons associated in fact for the purpose of misappropriating Plaintiff's assets through fraud, deceit,

misrepresentation, and theft (the "Fraudulent Invoice Enterprise").  The Fraudulent Invoice Enterprise operated continuously for at least seven years.

74.    The Fraudulent Invoice Enterprise is distinct from each of the Defendant "Persons" under 18 U.S.C. § 1961(a) because none of the Defendants are alleged to constitute an "Enterprise" under 18 U.S.C. § 1961(4).

75.    The Defendants engaged in a pattern of racketeering activity through engaging in at least two incidents of fraud and theft, which incidents were violations of, among other things, O.C.G.A. §§ 16-8-2, 16-8-3, 16-8-4, 23-2-52, 51-61-1, 51-6-2, 51-6-4.  Specifically, and as set forth in more detail elsewhere in this Complaint, Defendants submitted invoices to M3 falsely representing that certain services were performed for M3 that were never performed and that certain services were performed by legitimate third-party vendors at a certain cost when in reality the costs of those services was significantly less than represented. Defendants made these false representations knowingly, intentionally, and with malicious intent to induce M3 to rely on these misrepresentations and remit payment to Defendants for services that were never performed or in an amount higher than that charged by legitimate third-party vendors.

76.     Each Defendant agreed to and did participate in the enterprise and the illegal activity of the enterprise directly through, among other things, the creation and submission of invoices containing misrepresentations.

77.     M3 did in fact rely on Defendants' misrepresentations and remit payment as induced by Defendants.

78.     This practice occurred at least 61 times when Defendants crafted separate fraudulent invoices for services rendered by Chetu and ANMSoft.  The Defendants intentionally deceived Plaintiff in this respect over the span of seven years. All of these acts occurred after July 1, 1980 and at least one incident occurred within four years of a prior incident.   These invoices containing misrepresentations were created by Defendants, or at the Defendants' direction, in a like manner and submitted to Plaintiff on a monthly basis.   Accordingly, the Defendants' engaged in a pattern of racketeering activity.

79.     In violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et. seq*., Defendants conspired to engage in, and did engage in, certain predicate acts over time in a concerted effort to accomplish the predominant objective of systematically defrauding the Plaintiff.

80.     Defendants engaged in monetary transactions in property derived from specified unlawful activity, which is considered a predicate act under the

federal RICO Act. 18 U.S.C. § 1961. Defendants are in violation of this federal crime listed in 18 U.S.C. § 1957 as they did knowingly attempt to engage in, and did engage in, monetary transactions in property that was derived by criminally defrauding the Plaintiff. These transactions occurred each time Defendants submitted a falsified invoice to Plaintiff, which Plaintiff ultimately did remit to Defendants.

81.    Defendants also engaged in predicate acts of mail fraud as listed under 18 U.S.C. § 1961.  Defendants violated this federal statute by devising a scheme to obtain money or property by means of false or fraudulent pretenses, and using the postal service in furtherance of that scheme.  Each time M3 submitted checks to the Defendants as payment for fraudulent services or Defendants submitted or received invoices through the mail, Defendants utilized the postal service in furtherance of their scheme to fraudulently misappropriate funds from Plaintiff.

82.    These predicate acts took place over the span of a seven year period.

83.    As a direct and proximate result of the Defendants' efforts to devise and implement a scheme to defraud the Plaintiff for their own pecuniary benefit, Plaintiff suffered an injury in the amount of at least $2,673,306.  Such injury was by reason of Defendants' substantive RICO violations and as a direct and

proximate result of the commission of the mail fraud and the Defendants' engagement in monetary transactions derived from specified unlawful activity.

## COUNT V: CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO ACT
### (AGAINST ALL DEFENDANTS)

84.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

85.     Defendants each agreed and conspired to accomplish the common and unlawful plan of misappropriating funds belonging to M3 through the fraudulent scheme of the Fraudulent Invoice Enterprise.

86.     As a direct and proximate result of Defendants' conspiracy to defraud M3 in violation of the federal RICO Act, Plaintiff suffered injury in the form of misappropriated assets of at least $2,673,306.

## COUNT VI: CONVERSION
### (AGAINST ALL DEFENDANTS)

87.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

88.     Plaintiff has a legal right of possession to a minimum of $2,673,306 in payments that were made to B.O.S.S. and Kaleo as a result of fraudulent billing statements submitted to M3 by Dean, B.O.S.S., Kaleo, and DJ.

89.     Although the Defendants represented to Plaintiff that those payments were made in exchange for services rendered to M3, there were no services rendered in exchange for the overpayments made by M3 in the amount of $2,673,306.

90.     Dean and Landreneau deposited the money into accounts that they controlled.

91.     Plaintiff has made a demand for the return of the converted property, but the Defendants have failed to provide it.  In the alternative, M3 hereby makes a demand for the return of the converted property.

92.     Defendants acted willfully and maliciously in an effort to systematically defraud the Plaintiff for millions of dollars.

93.     As a result of this illegal conversion, M3 has been harmed by at least $2,673,306.

## COUNT VII: UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

94.     M3 realleges and incorporates by references paragraphs 1 through 29 as if fully set forth herein.

95.     In the alternative, M3 asserts this claim based on the contract implied in law.

96.     A benefit has been conferred on the Defendants in the amount of approximately $2,673,306.  Defendants obtained this money by enacting a scheme to submit falsified invoices to M3 for services that were never rendered.

97.     It would be unjust and inequitable to allow the Defendants to retain the benefit conferred because they made intentionally false representations to M3 to induce M3 to submit the payments to Defendants on the pretense that legitimate services had been rendered to Plaintiff.  In reality, B.O.S.S. and Kaleo Technology were not legitimate companies and there were no services rendered in exchange for the overpayments made by M3 in the amount of not less than $2,673,306.

98.     Plaintiff has been damaged by Defendants' actions to defraud the company, and Plaintiff demands the return of the property at issue to which the Defendants have no entitlement.

## COUNT VIII: BREACH OF FIDUCIARY DUTY
## (AGAINST WESLEY DEAN)

99.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

100.    As the Executive Vice President of Technology and a shareholder of the company, Dean was in a position of trust and owed M3 certain fiduciary duties, including the duty of loyalty, duty of care, and the duty of good faith and fair dealing.

101.   Dean was vested with the authority to bind M3 to certain contracts that he entered into with third party vendors on behalf of the company.

102.   Dean used his position of trust within M3 to his advantage at the expense of M3 by hiring vendors to perform services for the company and then falsifying billing statements to overcharge the company.

103.   At all times relevant, Dean was in a fiduciary, confidential, or special relationship with M3.

104.   Dean breached the duties of loyalty, care, and good faith and fair dealing by failing to inform the Plaintiff of his affiliation to B.O.S.S. and the true nature of the company.

105.   Dean breached the duties of loyalty and good faith and fair dealing by failing to inform the Plaintiff of his relationship to B.O.S.S., DJ, and Kaleo Technology.

106.   Dean breached the duties of loyalty and good faith and fair dealing by misrepresenting to the Plaintiff the extent of the services being provided by third party vendors.

107.   Dean breached the duties of loyalty and good faith and fair dealing by submitting falsified billing statements to the Plaintiff.

108.   Dean breached the duties of loyalty and good faith and fair dealing by misappropriating corporate assets from the Plaintiff and retaining those assets in an account that he controlled.

109.   Dean breached the duties of good faith and fair dealing by appropriating for himself the assets and property of M3, to the detriment of the corporation and to the exclusion of the other shareholders.

110.   Dean acted intentionally and with malice to defraud M3 of millions of dollars for his own personal use at the expense of M3 and its shareholders.

111.   Through his extensive wrongful conduct set forth in this Complaint, Dean also breached the duty of care.

112.   Dean knew that he owed M3 at least one fiduciary duty.

113.   As a direct and proximate result of Dean's breach of the duties of loyalty and good faith and fair dealing, M3 suffered damages.

## COUNT IX: VIOLATION OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT
### (AGAINST WESLEY DEAN)

114.   Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs as if  set forth fully herein.

115.   Defendant Wesley Dean knowingly and with intent to defraud Plaintiff exceeded his authorized access to a protected computer in order to steal

corporate funds for his benefit. This conduct is in violation of the Federal Computer Fraud and Abuse Act. 18 U.S.C. § 1030(a)(4).

116.   Any computer utilized by Dean while working at M3 would qualify as a "protected computer" under the statutory definition as it would have been "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2).

117.   At all times relevant, M3's Use of Company Equipment and Computer Systems, limited its employees' use of company property to solely company business, with the exception of the personal use of M3's computer systems solely for educational or charitable activities.

118.   Dean exceeded his authorized access by using protected computers at M3 to perpetrate fraud on the company. Specifically, Dean accessed a protected computer and utilized the company email system as a means to communicate misrepresentations about B.O.S.S. and his affiliation with B.O.S.S. and Kaleo Technology. He also utilized the company email system to submit fraudulent invoices that appeared to be from B.O.S.S.  Dean improperly erased the hard drive of his M3 work computer in order to conceal evidence of his crimes.

119.   As a result of these actions, Dean fraudulently obtained in excess of $5,000 from Plaintiff by submitting falsified invoices to the company and misappropriating part of the payments to a bank account controlled by Dean.

## V.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff M3 Accounting Services, Inc. respectfully prays for relief as follows:

a.   Judgment in favor of Plaintiff and against Defendants with respect to all claims alleged herein;

b.   Judgment in an amount equal to three times the actual damages pursuant to 18 U.S.C. § 1964(c) and OCGA 16-4-4;

c.   Judgment entered ordering Defendants to pay punitive damages to Plaintiff;

d.   Consequential damages and interest pursuant to Plaintiff's conversion claim;

e.   Attorneys' fees and costs of investigation and litigation reasonably incurred;

f.   An award of any such other relief as this Court deems just and proper.

## VI.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:       December 26, 2018              Respectfully submitted,

                                           /s/ *Jason A. Morris*

                                           CARLTON FIELDS JORDEN
                                           BURT, P.A.

                                           Walter H. Bush
                                           Georgia Bar No. 098825
                                           Jason A. Morris
                                           Georgia Bar No. 608298
                                           Amanda D. Proctor
                                           Georgia Bar No. 776848

                                           1201 West Peachtree Street
                                           Suite 3000
                                           Atlanta, Georgia  30309-3455
                                           (404) 815-3400
                                           (404) 815-3415 (fax)
                                           Email: wbush@carltonfields.com
                                           jmorris@carltonfields.com
                                           aproctor@carltonfields.com

                                           ***Attorneys for Plaintiff***
                                           ***M3 Accounting Services, Inc.***

116345317.3