UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| M3 ACCOUNTING SERVICES, INC.,<br><br>   Plaintiff,<br><br> v.<br><br>WESLEY DEAN, DARRYL J. LANDRENEAU, KALEO TECHNOLOGY, LLC**,** and BLACK OPS SOLUTIONS & SYSTEMS, LLC,<br><br>   Defendants. | CIVIL ACTION NO.<br>2:18-CV-00246-RWS |

## **O R D E R**

This case is before the Court on Defendants Kaleo Technology, LLC and Darryl J. Landreneau's Motion to Dismiss [25], as well as Defendant Wesley Dean's Motion to Dismiss [26].  After reviewing the record, the Court enters the following Order.

## Background[1]

This case involves an alleged fraudulent invoice scheme orchestrated by Plaintiff's former employee, Defendant Wesley Dean, and his accomplice Darryl J. Landreneau (collectively the "Individual Defendants") through their companies Defendants Black Ops Solutions & Systems, LLC ("B.O.S.S.") and Kaleo Technology, LLC ("Kaleo") (collectively the "Company Defendants"). In short, Plaintiff claims the Individual Defendants misrepresented various elements about the Company Defendants to entice Plaintiff into paying for false services and fees.

Plaintiff employed Dean as its Executive Vice President of Technology from May 3, 2010, to October 6, 2014. (Amended Complaint, Dkt. [18] ¶ 9.) In this role, he was given broad authority to contract with third-party vendors on behalf of Plaintiff to assist in developing security software. (Id. ¶¶ 9-10.) During that time, Dean also accrued enough stock to become the third-largest owner of the company. (Id. ¶ 9.)

---

[1] As this case comes before the Court on motions to dismiss, the Court accepts as true the facts alleged in the Amended Complaint. Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted). This includes Plaintiff's Exhibits A-E as they are attached to the Amended Complaint and incorporated therein by reference. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")

On August 10, 2010, Dean filed Articles of Incorporation with the Secretary of State in Georgia for B.O.S.S., listing himself as the LLC's sole member and manager.  (Id. ¶ 15.)  Thirteen days later, Dean proposed that Plaintiff use B.O.S.S. as a vendor to provide specialized services.[2]  (Id. ¶ 22.)  However, Dean's portrayal of B.O.S.S. misrepresented the company's experience and omitted Dean's involvement altogether.  (Id. ¶ 24.)  Specifically, Dean said B.O.S.S. was "commonly known in the world of private military contractors."  (Id. ¶ 22, Exhibit A.)  He also claimed to have visited the company's purported facilities abroad and to have personally utilized their services "in the past for various 'skunkworks' projects that required strong accountability as well as some measure of discretion." (Id.)  Yet, B.O.S.S., having been formed less than two weeks before, had no reputation in the field, ability to provide services beyond what Dean himself could do, or facilities of any kind. (Id. ¶ 23.)

After Dean convinced M3 to use B.O.S.S. in August 2010, Dean and Landreneau began their fraudulent invoice scheme that lasted until March 2017. While Plaintiff believed the company served as "project manager" or an

---

[2] In support of this allegation, Plaintiff references an attached email exchange between Dean and Allen Read, M3's President, discussing B.O.S.S. (Am. Compl., Dkt. [18-1] Exhibit A.)

intermediary company between M3 and third-party vendors and received invoices accordingly, Dean and Landreneau intentionally used B.O.S.S. as a shell company to carry out their scheme. (Id. ¶¶ 26, 27, 30, 33.) Dean and Landreneau created invoices from B.O.S.S. to Plaintiff, charging for services the company did not provide, and overcharging for bills paid to third-party vendors.

In 2012, Landreneau formed Kaleo and is listed as the manager and registered agent on the company's Articles of Incorporation. (Id. ¶ 19.) Once formed, Plaintiff began paying B.O.S.S.'s invoices to Kaleo, at Dean's instruction. (Id. ¶ 35.) Dean later persuaded Plaintiff to use Kaleo as a vendor. In reality, he and Landreneau used Kaleo as a shell company, like B.O.S.S. (Id. ¶ 30.)

*Misrepresented Services*

Plaintiff alleges B.O.S.S. and Kaleo's services were repeatedly misrepresented in invoices to Plaintiff. (Id. ¶ 30.) It appears Plaintiff categorizes B.O.S.S.'s services as project/vendor management, processing, and software. (Id. ¶¶ 28, 43.) Of those, B.O.S.S. provided processing services and software but did not provide legitimate project/vendor management. (Id.) For example, in one invoice from October 21, 2010, B.O.S.S. represented that three of its engineers spent 528 hours researching for a project called "ACH Project." (Id. ¶ 31, Exhibit B.) Plaintiff alleges the only people employed by B.O.S.S. at that time were

Dean, Landreneau, and a third individual, none of whom were engineers. (Id. ¶¶ 28, 29, 32.) Further, any work done by Dean for B.O.S.S. violated M3's company policies and any project management services would have been the same that he was obligated to perform in his role at M3. (Id. ¶¶ 25, 29.)

*Overcharging for Third-Party Vendors*

B.O.S.S. and Kaleo also overcharged Plaintiff for work done by legitimate third-party vendors. As the intermediary, B.O.S.S. paid vendors for Plaintiff's work and then billed Plaintiff accordingly. (Id. ¶ 34.) B.O.S.S., however, billed Plaintiff for more than what it paid the vendor. (Id.) For example, while an invoice from December 15, 2010, shows B.O.S.S. billed Plaintiff $68,000 for ANMSoft services, an invoice from November 16, 2010, shows ANMSoft only charged Plaintiff $23,606 for the same services. (Id. ¶ 34, Exhibits C-D.) Thus, Plaintiff alleges B.O.S.S. overcharged them by $44,394 in this invoice alone and approximately $1,113,003 for all inflated ANMSoft charges from September 2010 through March 2015. (Id. ¶¶ 34, 35.) And, records from ANMSoft indicate their services for M3 occurred between November 2010 and August 2012. (Id. ¶ 35.)

B.O.S.S. inflated invoices for another third-party vendor, Chetu, from July 2012 through March 2015. (Id. ¶ 38.) This time, Chetu rendered services to Kaleo on behalf of B.O.S.S. (Id.) B.O.S.S. then billed M3. (Id.) Here, Plaintiff claims

B.O.S.S.'s overcharges total approximately $1,560,303. (Id.) Chetu's records also indicate the legitimate services took place between September 2012 and May 2015. (Id.)

Dean concealed the scheme through a combination of legitimate work and continued misrepresentations about B.O.S.S.'s services. (Id. ¶¶ 36, 42, 43.) Defendants submitted invoices for legitimate ACH processing services performed by B.O.S.S. and Kaleo and provided software used with those services. (Id. ¶ 43.) Further, on March 17, 2011, Dean represented to Allen Read in writing that B.O.S.S. was an essential vendor comprised of a "team" who provided an array of services for M3's projects and saved the company costs in the long term. (Id. ¶ 36, Exhibit E.) Plaintiff argues these tactics, combined with Dean's position of trust and elevated status as a shareholder at M3, kept Defendants' scheme hidden. (Id. ¶¶ 36, 42, 43.)

On October 6, 2014, amid this scheme, Plaintiff terminated Dean for unrelated reasons. (Id. ¶ 11.) A separation agreement memorialized the termination and detailed terms such as stock buy-back, Plaintiff's release of claims against Dean arising from his job performance, and a continued relationship between M3 and Dean as a consultant. (Id. ¶ 14.) After his departure, Dean

continued as a consultant, submitting false and inflated invoices through 2015. (Id. ¶¶ 31-44.)

In March 2018, Plaintiff discovered Defendants' fraudulent scheme when law enforcement contacted it concerning an investigation into Dean. (Id. ¶ 45.) Plaintiff then hired forensic accountants who traced the stolen funds to Defendants, indicating that they used the money to purchase hunting gear, boating-related expenses, cars, sporting tickets, and gold, among others. (Id. ¶ 48.)

On December 26, 2018, Plaintiff filed its Complaint [1] bringing federal and state claims against all Defendants. On February 4, 2019, the Clerk of Court entered default against Defendant B.O.S.S. for failure to plead or otherwise defend. Plaintiff has since filed an Amended Complaint [18] that the remaining Defendants now move to dismiss [25, 26]. The Court sets out the legal standard governing Defendants' Motions to Dismiss before considering the motions on the merits.

## Discussion

### I.    Motion to Dismiss Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of

a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In order to

withstand a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Id.

(quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when the

plaintiff pleads factual content necessary for the court to draw the reasonable

inference that the defendant is liable for the conduct alleged.  Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true,

and the reasonable inferences therefrom are construed in the light most favorable

to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir.

1999).  However, the same does not apply to legal conclusions set forth in the

complaint.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252,1260 (11th Cir. 2009)

(citing Iqbal, 556 U.S. at 678).  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S.

at 678.  Furthermore, the court does not "accept as true any legal conclusion

couched as a factual allegation." Twombly, 550 U.S. at 555.

## II.    Analysis

In its Amended Complaint [18] Plaintiff asserts claims against all

Defendants for conversion (Count VI), unjust enrichment (Count VII), and

violation of both the federal and Georgia civil RICO acts (Counts II, IV). Against

Defendants Dean, B.O.S.S., and Kaleo, Plaintiff also asserts a fraud (Count I)

claim. Plaintiff additionally alleges Defendant Dean breached a fiduciary duty

(Count VIII) and violated the Computer Fraud and Abuse Act ("CFAA") (Count

IX).

Defendants Dean, Landreneau, and Kaleo move to dismiss the Amended

Complaint [25, 26].[3] First, all moving Defendants argue statutes of limitations bar

Plaintiff's federal RICO and state law claims. Second, they contend Plaintiff's

claims each fail to state a claim upon which relief can be granted. Third,

Defendant Dean preliminarily argues the Separation Agreement bars Plaintiff's

claims against him. The Court will consider these arguments in turn.

a.  Statute of Limitations

Defendants Kaleo, Landreneau, and Dean argue Plaintiff's Federal RICO

claim and state law claims for fraud, conversion, unjust enrichment, and breach of

fiduciary duty are barred by statutes of limitations and should be dismissed

accordingly. "[A] Rule 12(b)(6) dismissal on statute of limitations grounds is

---

[3] While Defendant Dean filed a separate motion from Defendants Landreneau and Kaleo, all Defendants challenge Plaintiff's Amended Complaint similarly. Therefore, the Court will address their arguments collectively while noting any differences as necessary.

appropriate only if it is apparent from the face of the complaint that the claim is time-barred." Lindley v. City of Birmingham, 515 Fed.Appx. 813, 815 (11th Cir. 2013) (internal quotations omitted). "In other words, at the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." Id. (internal citations omitted). Instead, where the expiration of the statute cannot be determined from the face of the complaint, a motion for summary judgment is the proper procedure. See AVCO Corp. v. Precision Air Parts, Inc., 676 F.2d 494, 495 (11th Cir. 1982).

At issue is when the statutes began to run. It is undisputed that a four-year statute of limitations applies to all but Plaintiff's Georgia RICO claim and that Plaintiff filed suit on December 26, 2018. Defendants argue the claims are time-barred because Plaintiff was injured in fall 2010, well outside of the four-year mark. Plaintiff contends it reasonably did not discover the injury until March 2018, which is the date the statute of limitations began to run for the federal RICO claim, and tolls the statutes of limitations for the state law claims due to Defendant Dean's fraudulent misrepresentations. The Court agrees that all claims are timely, based on the allegations in Plaintiff's Amended Complaint.

### i. *Federal RICO*

RICO's civil enforcement provisions are subject to a four-year limitations period that runs from the moment a diligent plaintiff discovered or should have discovered an injury to itself.  Rotella v. Wood, 528 U.S. 549, 553, 558-59 (2000); White v. Mercury Marine, Div. of Brunswick, Inc., 129 F.3d 1428, 1998 A.M.C. 305 (11th Cir. 1997).

All parties appear to agree Plaintiff was injured by payment of allegedly fraudulent invoices beginning fall 2010.[4]  (Defendant Landreneau and Kaleo's Motion to Dismiss ("Landreneau and Kaleo's MTD"), Dkt. [25] at 8; Defendant Dean's Motion to Dismiss ("Dean's MTD"), Dkt. [26] at 8.)  Plaintiff, however, alleges in its Amended Complaint that it did not discover the injury until March 2018, well within the statute of limitations.  Therefore, to successfully bar Plaintiff's federal RICO claim at the motion to dismiss phase, Defendants must show that it is evident from the face of Plaintiff's complaint that it should have discovered the injury sooner.

Defendants offer two reasons why Plaintiff's exercise of reasonable diligence should have led to earlier actual knowledge of injury.  First, Defendants

---

[4] Plaintiff effectively concedes this point by failing to challenge it in responsive pleadings.  (Pl.'s Resps., Dkts. [27, 28].)

argue Plaintiff should have discovered its injury sooner because it possessed the allegedly fraudulent invoices. Because the invoices specified the precise amounts paid for each service, Defendants maintain Plaintiff was aware that it was paying for the services it now alleges were fraudulent. (Landreneau and Kaleo's MTD, Dkt. [25] at 8-9.) In response, Plaintiff argues the invoices it had did not evidence the fraud alone because it trusted Dean that the charges from B.O.S.S. were legitimate, as he was the company contact with the vendors. Further, Plaintiff did not obtain the original invoices from ANMSoft and Chetu—exposing Defendants' inflated invoices for those third-party vendors—until it conducted its investigation in 2018. (Am. Compl., Dkt. [18] ¶ 46.) The Court finds that Plaintiff's possession of the allegedly fraudulent invoices alone is insufficient to alert it to the probability that it had been misled, especially given the close fiduciary relationship between Plaintiff and the invoice orchestrator, Defendant Dean.

Defendant Dean also suggests that Plaintiff should have discovered the injury when it discharged Dean for destroying company property in October 2014. It appears Dean argues that with Dean's discharge from the company, Plaintiff should have been on notice that he could breach his fiduciary duties in other ways. Any insinuation that Plaintiff should have discovered that Dean had been lying to them about B.O.S.S. since he first joined the company because he destroyed

company property is a stretch.  In fact, it appears Dean left M3 on good terms and continued to consult for the company.  Plaintiff's Amended Complaint demonstrates continued good-will between it and Dean—despite allegations that Dean continued to defraud Plaintiff —until the police alerted Plaintiff to the scheme in March 2018.  (Id. ¶¶ 14, 43, 61.)

On the face of Plaintiff's Amended Complaint, it appears Plaintiff reasonably did not discover its injury until March 2018.  Thus, its federal RICO claim is not time-barred, and Defendants' Motions [25, 26] are **DENIED** as to this issue.

### ii.  State Law Claims

Plaintiff's state law claims, except Georgia RICO, are all subject to four-year statutes of limitations.  O.C.G.A. § 9-3-32 (conversion); Renee Unlimited, Inc. v. City of Atlanta, 687 S.E.2d 233, 237 (Ga. Ct. App. 2009) (unjust enrichment); Hendry v. Wells, 650 S.E.2d 338, 343 (Ga. Ct. App. 2007) (breach of fiduciary duty); Paul v.  Destito, 550 S.E.2d 739, 745–46 (Ga. Ct. App. 2001) (fraud).  The limitation period for each began to run when the cause of action accrued, in other words, the date that suit on the claim could first be brought.  Id. Plaintiff does not contest the causes of actions accrued outside the statutes of

limitations windows but instead argues they were tolled by Defendants' fraudulent conduct. The Court agrees.

Georgia law provides that where actual fraud is the gravamen of the action, the statute of limitations is tolled until the fraud is either discovered or should have been discovered. See O.C.G.A. § 9-3-96. Plaintiff's Amended Complaint rests almost entirely on allegations of Defendants' actual fraud. Thus, for the same reasons Plaintiff's federal RICO claim is not time-barred, the statutes of limitations on Plaintiff's state law claims are tolled until the discovery of the fraud, which was reasonably in March 2018. Accordingly, Defendants' Motions [25, 26] are **DENIED** as to this issue as well.

### b. The Separation Agreement

Defendant Dean argues the Separation Agreement, referenced in Plaintiff's Amended Complaint and filed under seal by Defendant Dean with his Motion to Dismiss, "justified [his] full dismissal." (Dean's MTD, Dkt. [26] at 2.) "The district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint." See, e.g., Day v. Taylor, 400 F.3d 1272, 1275-76 (11th Cir. 2005). However, at the motion to dismiss phase, the Court may consider "a document attached to a motion to dismiss . . . if the attached document is (1) central to the plaintiff's claim and (2)

undisputed." Id. (citing <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1134 (11th Cir. 2002)). "'Undisputed' means that the authenticity of the document is not challenged." <u>Id.</u>

It is premature to consider the Separation Agreement at this stage for two reasons. First, Plaintiff contests the agreement's authenticity.[5] (Pl.'s Resp. to Def. Dean's MTD, Dkt. [27] at 8.) Second, Dean essentially argues that the language of the separation agreement speaks for itself. He provides little argument or citation to authority for why the agreement bars Plaintiff's claims against him in his Motion [26]. Instead, he includes references to cases and some legal arguments for the first time in his Reply [30], to which Plaintiff has not had the opportunity to respond. Thus, the Court finds that the Separation Agreement should be considered with the other evidence at the summary judgment phase.[6] Defendant's Motion [26] is therefore **DENIED** as to this issue.

     c.  <u>Failure to State a Claim – Rule 12(b)(6)</u>

---

[5] The Court is skeptical of Plaintiff's authenticity concern given its own reference to the Separation Agreement and failure to challenge Dean's motion to file it under seal.

[6] The Court also notes that Defendant's argument does not support dismissal of Defendant Dean. If the Separation Agreement bars Plaintiff's claims against Dean for his actions during his employment, Plaintiff still alleges Dean continued his fraudulent invoice scheme as a consultant from October 2014 to March 2015. (Am. Compl., Dkt. [18] ¶¶ 31-44.)

Defendants argue Plaintiff's claims for fraud (Count I), Georgia RICO (Count II), and federal RICO (Count IV) should be dismissed for failure to state a claim upon which relief can be granted. Defendant Dean additionally moves to dismiss Plaintiff's claims for conversion (Count VI), unjust enrichment (Count VII), breach of fiduciary duty (Count VIII), and violation of the CFAA (Count IX). The Court will consider these arguments in turn.

### i. Fraud (Count I), Georgia RICO (Count II), and Federal RICO (Count IV)

Defendants move to dismiss Plaintiff's fraud and civil RICO claims for failure to comply with the heightened pleading requirements of Rule 9(b) and failure to allege the essential elements of these claims. Under Rule 9(b), to state a claim for fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9 (b). To comply with the particularity requirement of Rule 9(b), Plaintiffs' Complaint must set forth:

> (1) precisely what statements were made in what documents or oral
> representations or what omissions were made, and (2) the time and
> place of each such statement and the person responsible for making
> (or, in the case of omissions, not making) same, and (3) the content of
> such statements and the manner in which they misled the [P]laintiff,

and (4) what the [D]efendants "obtained as a consequence of the fraud."

Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1371 (11th Cir. 1997) (citations omitted). Civil RICO claims, "which are essentially a certain breed of fraud claims," are subject to the same heightened pleading requirements. Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007).

In this case, Plaintiff has sufficiently pled its fraud and civil RICO claims with particularity. With respect to Plaintiff's fraud claim, Plaintiff alleges Defendant Dean misrepresented B.O.S.S.'s credentials, (Am. Compl., Dkt. [18] ¶¶ 22-24, 36) B.O.S.S. and Kaleo's work, (Id. ¶¶ 27-28, 30, 32, 36-37) and the amount owed to third-party vendors in invoices. (Id. ¶¶ 34-35, 38.) Further, Plaintiff alleges Defendant Landreneau is also responsible for the invoice misrepresentations because he helped create them.[7] (Id. ¶¶ 30, 33.) Company Defendants B.O.S.S. and Kaleo are similarly liable as sham companies that

_____

[7] Defendant Landreneau continually argues Plaintiff's claims fail against him because he was not an M3 employee. Unlike Defendant Dean, Defendant Landreneau does not owe Plaintiff fiduciary duties, as reflected in Plaintiff's Amended Complaint. That said, his employment status does not absolve him from fraudulent activity. Plaintiff's allegations that Landreneau created invoices that overcharged M3 for third-party vendors alone are sufficient.

overcharged M3 for services they engaged third-party vendors to perform. (Id. ¶¶ 35, 38, 40, 43.)  Plaintiff provides specific dates for when some of the many misrepresentations occurred and attached invoices and emails to its Amended Complaint.[8]  As a result of these misrepresentations, Plaintiff claims it lost at least $2.6 million that the Defendants then used on lavish purchases.

Plaintiff's RICO claims are likewise adequately pled.  Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4(a).  Similarly, the federal RICO statute "makes it unlawful 'to conduct or participate, directly or indirectly, in the conduct of [an] enterprise [that affects interstate commerce] through a pattern of racketeering activity.'"  Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 948 (11th Cir. 1997) (quoting 18 U.S.C. § 1962(c)).  "[T]o state a prima facie civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must establish 'three essential elements': first, that the defendant committed a pattern of RICO predicate acts under 18 U.S.C. § 1962;

_____

[8] See pages 14-15 of Plaintiff's Response to Defendants' Landreneau and Kaleo's Motion to Dismiss [28] for a specified list of Defendants' alleged fraudulent acts.

second, that the plaintiff suffered injury to business or property; and, finally, that the defendant's racketeering activity proximately caused the injury." Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 705 (11th Cir. 2014) (quoting Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)).

Congress has defined "racketeering" activity as a violation of the criminal statutes listed in § 1961(1). "To successfully allege a pattern of racketeering activity, [Plaintiff] must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1264 (11th Cir. 2004). Georgia defines "racketeering activity" as "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under [certain enumerated laws]." O.C.G.A. § 16-14-3(9)(A)

Plaintiff's RICO claims are premised on the same allegations underlying its fraud claim—an elaborate fraudulent invoice scheme involving at least 61 inflated invoices from 2010 to at least 2015. If proven, these related predicate acts demonstrate criminal conduct under Georgia law, including potential violations of O.C.G.A. §§ 16-8-2 (theft by taking), 16-8-3 (theft by deception), 16-8-4 (theft by

conversion), 23-2 -52 (misrepresentation), 51-6-1 (fraud), 51-6-2 (deceit; misrepresentation of fact; concealment of fact; knowledge of falsehood), 51-6-4 (fraud by acts of silence), as well as mail fraud under 18 U.S.C. §1961. Further, Plaintiff's financial loss is a direct result of Defendants' allegedly fraudulent scheme.

Defendants Landreneau and Kaleo argue Plaintiff has not established that there was a "pattern of racketeering activity" because Defendants' predicate acts were undertaken in furtherance of a single transaction. There are two separate requirements for a showing of "pattern" under the federal RICO statute, relatedness and continuity. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989). Defendants' challenge goes to the latter. Continuity is established one of two ways: (1) closed-ended continuity--"a closed period of repeated conduct;" and (2) open-ended continuity--"past conduct that by its nature projects into the future with a threat of repetition." Id. at 241; see also Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1397 (11th Cir. 1994), opinion modified on reh'g, 30 F.3d 1347 (11th Cir. 1994).

The Court finds Plaintiff has alleged closed-ended continuity. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."

Id. at 242. "[N]o court has unequivocally declared a minimum period of time that can be considered 'substantial,'" but the weight of authority suggests that "the substantial period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year." Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1266 (11th Cir. 2004) (emphasis original).

It is undisputed that Defendants' alleged scheme extended for a substantial period of time. Instead, Defendants argue that "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time."[9] Jackson, 372 F.3d at 1267. That said, the Eleventh Circuit has also held that "[a]cts that are part of the same scheme or transaction can qualify as distinct predicate acts," Bank of America v. Touche Ross & Co., 782 F.2d 966, 971 (11th Cir.1986), as long as "each act constitutes a separate violation of the state or federal statute governing the conduct in question," United States v.

---

[9] Defendants rely on, Norfolk S. Ry. Co. v. Boatright R.R. Products, Inc., 2:17-CV-01787-AKK, 2018 WL 2299249, at *5 (N.D. Ala. May 21, 2018), on reconsideration in part, 2:17-CV-01787-AKK, 2019 WL 1199836 (N.D. Ala. Mar. 14, 2019), yet fail to acknowledge that court's reconsideration of Plaintiff's RICO claim. Ultimately, it found Plaintiff alleged both closed and open-ended continuity. Thus, the Court does not find this authority persuasive to Defendants' argument.

Watchmaker, 761 F.2d 1459, 1475 (11th Cir.1985) (internal quotations omitted), cert. denied, 474 U.S. 1100 (1986).  "'If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which they arose.'" United States v. Gonzalez, 921 F.2d 1530, 1545 (11th Cir.1991) (quoting Bank of America, 782 F.2d at 971).  Thus, even a "single episode of bribery could be viewed by a jury as a scheme consisting of multiple violations, sufficiently interrelated and continuous to constitute a pattern of racketeering activity." Cox, 17 F.3d at 1397.  Ultimately, no specific method of proof exists for establishing continuity, and the analysis turns "on the specific facts of each case." H.J. Inc., 492 U.S. at 241.

Here, Plaintiff alleges a fraudulent scheme consisting of at least 61 separate invoices and continuing over at least five years.  Further, Defendant Dean made additional misrepresentations to maintain the scheme, and after successfully running it for a few years, expanded the operation by adding Kaleo.  Even as circumstances changed with Dean's termination, the scheme continued.  Finally, while the scheme against M3 appears to have ended in 2017, Plaintiff alleges it continued with Dean's subsequent employer. (Pl.'s Am. Compl. Dkt. [18] ¶¶ 50-52.)  Thus, while multiple victims are not required for closed-ended continuity, allegations of their existence coupled with the duration and volume of this scheme

demonstrate that this was more than a "single transaction." <u>See</u> <u>H.J. Inc.</u>, 492 U.S. at 240 ("[I]t is implausible to suppose that Congress thought continuity might be shown only by proof of multiple schemes."); <u>see also</u> <u>Norfolk S. Ry. Co. v. Boatright R.R. Products, Inc.</u>, 2:17-CV-01787-AKK, 2019 WL 1199836, at *4 (N.D. Ala. Mar. 14, 2019) ("[T]he court finds that Norfolk Southern may adequately allege closed-ended continuity by alleging the existence of multiple victims of a purported scheme which lasted for approximately five years.").

Defendants' argument similarly fails on Plaintiff's Georgia RICO claim. In 2001, the Georgia Legislature Amended Georgia's RICO Act to eliminate the single transaction defense. <u>See</u> <u>Andert v. Branch Banking and Trust</u>, 1:14-CV-01160-AT (N.D. Ga. May 6, 2015) (providing a detailed legislative history of Georgia's RICO Act on this issue). Indeed, the plain language of the Georgia RICO Act defines "pattern of racketeering activity" to include two predicate acts in furtherance of one incident, scheme or transaction. O.C.G.A. § 16-14-3(8) (2001 amendment). While some Georgia courts may still allow the single transaction defense, the Court need not look beyond the clear statutory language.

Plaintiff has therefore plausibly alleged with particularity violations of both the Georgia and federal RICO statutes. Defendants' Motions to Dismiss Plaintiff's

fraud (Count I), Georgia RICO (Count II), and federal RICO (Count IV) claims are **DENIED** accordingly.

### ii. Computer Fraud and Abuse Act (Count IX)

The CFAA, a criminal statute prohibiting computer hacking, also provides a civil cause of action for any person who suffers damage or loss as a result of a violation of the Act where the conduct involves economic loss during any 1-year period aggregating at least $5,000 in value. 18 U.S.C. § 1030(g) (citing 18 U.S.C. § 1030(c)(4)(A)(i)(I).) Plaintiff alleges Defendant Dean violated § 1030(a)(4) when he used his work computer to execute and cover up the invoice scheme, in violation of M3's computer policy. (Am. Compl., Dkt. [18] ¶¶ 126-127.)

18 U.S.C. § 1030(a)(4), provides as follows: "[Whoever] knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value ... shall be punished." Thus, to state a claim pursuant to § 1030(a)(4) Plaintiff must allege that Dean "(1) knowingly and with intent to defraud (2) accessed a protected computer (3) without authorization or exceeding authorized access (4) obtained anything of value, (5) causing a loss resulting in economic damages aggregating at least $5,000." IPC Sys., Inc. v. Garrigan, No. 1:11-CV-3910-AT, 2012 WL 12872028, at *6 (N.D. Ga. May 21,

2012).  Defendants argue that Plaintiff's CFAA claim must fail because Dean did not exceed any authorized access.

In response, Plaintiff concedes Dean had authorization but maintains he exceeded his authorized access.  The CFAA defines "exceeds authorized access" to mean "access to a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter," 18 U.S.C. § 1030(e)(6).  That said, a violation for exceeding authorized access "does not depend upon the defendant's unauthorized *use* of information, but rather upon the defendant's unauthorized use of *access*."  Diamond Power Intern., Inc. v. Davidson, 540 F. Supp. 2d 1322, 1341 (N.D. Ga. 2007) (citation omitted, emphasis in original).  Put another way, "the proper inquiry is whether an employer had, at the time, both authorized the employee to access a computer and authorized that employee to access specific information on that computer."  Power Equip. Maint., Inc. v. AIRCO Power Servs., Inc., 953 F.Supp.2d 1290, 1296 (S.D. Ga. 2013).

In it's Amended Complaint, Plaintiff alleges Dean exceeded authorized access by using his work computer for nonbusiness purposes in two distinct ways.  First, Dean used the company email system to defraud M3 by communicating his misrepresentations to M3 about B.O.S.S. and Kaleo, as well as submitting the

invoices at issue. (Am. Compl., Dkt. [18] ¶ 127.) Second, Plaintiff alleges Dean

erased the computer hard drive to conceal evidence. (Id.) While Plaintiff concedes

Dean had almost unrestricted access to the protected computer, it claims all M3

employees' computer use was limited to "company business, with the exception of

personal use. . .solely for educational or charitable activities." (Id. ¶ 126.) Thus,

Plaintiff argues Dean exceeded that access when he used the computer for the

nonbusiness related activities alleged.

The Court is constrained by the Eleventh Circuit Court of Appeal's broad

interpretation of "exceeds authorized access." United States v. Rodriguez, 628

F.3d 1258, 1261 (11th Cir. 2010) (holding an employee "exceeded his authorized

access and violated the Act when he obtained personal information for a

nonbusiness reason."). This is because, while Rodriguez concerned the definition

of "exceeds authorized access" for a criminal violation of the CFAA, the Court

agrees with other District Courts that there is no reason to limit its application in

the civil context. See, e.g., Enhanced Recovery Co., LLC v. Frady, 3:13-CV-1262-

J-34JBT, 2015 WL 1470852, at *10 (M.D. Fla. Mar. 31, 2015).

That said, the Court also recognizes a split amongst the District Courts since

Rodriguez in cases involving an employee who, like Dean, had broad authorization

to access company computers and information, but did so in violation company

policies.  See Hamilton Grp. Funding, Inc. v. Basel, 311 F. Supp. 3d 1307, 1318

(S.D. Fla. 2018) (citing cases for both sides of the split).  Some courts

distinguished Rodriguez and instead applied a narrower interpretation of the

phrase.  See, e.g., Power Equip. Maint., Inc. v. AIRCO Power Servs., Inc., 953 F.

Supp. 2d 1290, 1296 (S.D. Ga. 2013) ("[E]xceeds authorized access simply means

that, while an employee's initial access was permitted, the employee accessed

information for which the employer had not provided permission.").  Others found

that restricting company computer access to business-related activity under

Rodriguez's broad view of the CFAA is a restriction on access and thus exceeds

authorized access.  See, e.g., Agilysys, Inc. v. Hall, 258 F. Supp. 3d 1331, 1342

(N.D. Ga. 2017).  Ultimately, while the Eleventh Circuit acknowledged the

disagreement over Rodriguez, it recently upheld its decision and clarified that "one

of the lessons from Rodriguez may be that a person exceeds authorized access if he

or she uses the access in a way that contravenes any policy or term of use

governing the computer in question."  EarthCam, Inc. v. OxBlue Corp., 703

Fed.Appx. 803, 808 n.2 (11th Cir. 2017).

Thus, considering the present state of the law, the Court concludes that

Rodriguez binds the Court to a broad interpretation of "exceeds authorized access"

under the CFAA and is not inclined to dismiss Plaintiff's claim. Defendant Dean's

Motion [26] is therefore **DENIED** as to this claim.

### iii. *Conversion (Count VI), Unjust Enrichment (Count VII), and Breach of Fiduciary Duties (Count VIII)*

Defendant Dean summarily moves to dismiss the remaining state law claims

against him because they depend on proof of fraud. Although the Court does not

agree that fraud is a required element of these claims, as previously discussed, the

Court finds Plaintiff has met the pleading standards for its fraud claim. Further,

while Dean raises various other challenges to Plaintiff's conversion, unjust

enrichment, and breach of fiduciary duties claims, the Court does not find any of

them persuasive. Instead, Plaintiff has adequately pled these claims. Accordingly,

his Motion [26] is **DENIED**.

### Conclusion

For the foregoing reasons, Defendants' Motions to Dismiss [25, 26] are

**DENIED**. The parties are **ORDERED** to participate in mediation with a Magistrate

Judge of this Court. The case is **REFERRED** to Chief Magistrate Judge Linda T.

Walker for assignment to a Magistrate Judge for mediation. If the case is not settled

in mediation, the parties are **ORDERED** to hold the Rule 26(f) Early Planning

Conference within 15 days after mediation, and the parties shall submit to the Court

the Joint Preliminary Report and Discovery Plan within 15 days after they hold their

Early Planning Conference.

      **SO ORDERED** this 14th day of August, 2019.

_____

**RICHARD W. STORY**
United States District Judge